ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -- )
 )
CI2, Inc. ) ASBCA Nos. 56257, 56337
 )
Under Contract No. DABNOl-03-C-0007 )

APPEARANCE FOR THE APPELLANT: HJ.A. Alexander, Esq.
 Alexander Law Firm, P.C.
 Atlanta, GA

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
 Army Chief Trial Attorney
 Kyle E. Chadwick, Esq.
 Trial Attorney

 OPINION BY ADMINISTRATIVE JUDGE DELMAN

 Under ASBCA No. 56257, CI2, Inc. (appellant) seeks additional compensation for
services of certain contract personnel allegedly owed under the contract. The government
asserts that appellant was fully and properly paid for the services provided. Under
ASBCA No. 56337, appellant seeks lost profits on award terms improperly denied by the
government. The government asserts that the government's decision to deny award terms
was consistent with the contract. The appeals were consolidated. A hearing was held on
entitlement. We have jurisdiction under the Contract Disputes Act (CDA), 41 U.S.C.
§§ 7101-7109.

 FINDINGS OF FACT

 1. On 11 December 2002, the contracting center, U.S. Army, Wiesbaden,
Germany (Army or government), issued Solicitation No. DABNOl-03-R-0001 for a
commercial items contract for non-personal services to support the Installation Access
Control System (IACS) at Army installations in Germany, the Netherlands, Belgium, and
Italy (R4, tab 1 at 4). The Army used the IACS, which included a database of biometric
information, to control access to Army installations using scannable access cards
(tr. 1/9-11).

 2. On 23 December 2002, the Army issued Solicitation Amendment No. 000 I
(Amendment 0001) (supp. R4, tab 72). This amendment included, among other things, a
Revised Annex A (Minimum Manning Requirements) to the Performance Work
Statement (PWS). The Revised Annex A showed the Army's requirements for IACS

 I
permanent registrars and temporary (4-month) registrars (TRs) at 22 installations/base
support battalions (BSBs) in seven area support groups (ASGs). (Id. at 2-3)

 3. Amendment 0001 also advised the potential offerors that registrars would start
work at the designated locations on a staggered basis, at approximately two installations
per week (see findings 5-7 below). Witnesses at the hearing referred to the staggered
fielding of registrars as the "ramp-up period" (tr. 1117-18, 42, 97-98, 2118-19).

 4. The Revised Annex A in solicitation Amendment 0001 also listed "Projected
Performance Periods" for TRs and "Projected Performance Start Date[s]" for permanent
registrars at each staffed location. The earliest projected performance date for registrars
was 10 February 2003 at Mannheim, Germany. Thereafter, registrars were to work at
approximately two installations per week, until the latest projected start date of 28 April
2003 at two installations in Italy. (Supp. R4, tab 72 at 2-3)

 5. In comments appended to the Revised Annex A in Amendment 0001, the
government stated as follows:

 Performance will begin 10 Feb 03 in Mannheim. This is a
 staggered fielding, with two new BSBs added each week. It
 is unlikely, but the fielding may be delayed due to the
 approval process, but not due to any equipment-related or
 network issues. The fielding schedule includes flexibility to
 push each BSB back by three weeks. If one BSB is delayed,
 all remaining BSBs requiring fielding will also be delayed.

(Supp. R4, tab 72 at 4)

 6. On 3 January 2003, CI2, based in Atlanta, submitted the only proposal in
response to the solicitation (R4, tab 1 at 1). Appellant's vice president of operations
oversaw the preparation of the proposal (tr. 1188-89). She understood the projected
performance dates for the registrars in the Revised Annex A for the ramp-up period and
factored that into appellant's proposal (tr. 1/96-98).

 7. Appellant's proposal expressly acknowledged the ramp-up period. As part of
its "Key Initial Procedures," CI 2 proposed that "[t]wo weeks prior to the fielding ofIACS
at each BSB," cI2 managers would "meet with Government representatives to coordinate
lo~al implementation of the contract." (R4, tab 1 at IIl-8)

 8. During negotiations, the government asked CI2 a clarification question that CI 2
restated as follows:

 2
 Employee absences[,] leave, sick leave, etc. Para. 1.6.4, Page
 43 (3) [r]equire[s] 35 permanent registrars ALL THE TIME
 (not good enough to say we will not bill for these absences!)
 How to identify, to correct, and to prevent??? Need more
 TRAINED registrars than the 35 permanents as the govt will
 only train once. Afterwards the contractor has to do the
 training. Need swingers! So effectively need more than 35
 permanent registrars (how many more?), but do not get paid
 for these (ideas)!

ci2 responded to the question, as pertinent, as follows:
 B. We have floats that are ready to go TDY. Source for
 these is future aspirants, former temps, and other[ s] that
 desire to be occasional employees.
 C. We may find that part-time employees (morning vs.
 afternoon) working in teams of two may offer us some
 flexibility. On balance if properly managed, the
 advantages can outweigh the disadvantages.

 All of this is doable.

(R4, tab 9 at 1, 2)

 9. By Memorandum for Record (MFR) dated 24 January 2003, the contracting
officer (CO) determined: "Because adequate price competition exists, and because CI2 's
proposed pricing is on par with the IGCE [independent government cost estimate] and
market research, and based in part on the Financial Services Team's review, I find CI2's
proposed pricing both fair and reasonable" (R4, tab 11 at 1-2). The CO's determination
included a comparison of appellant's proposed pricing over a five-year period, including
the potential award terms (see finding 10 below). On 29 January 2003, the Army
awarded to appellant commercial items Contract No. DABNOl-03-C-0007 (R4, tab 12).
Grant D. Carmine, appellant's European Operations Director, signed the contract on
behalf of CJ2 (supp. R4, tab 62). Mr. Carmine was the proprietor of Advanced Computer
Technologies GmbH (ACT), CI2's teaming partner and subcontractor, based in
Moerlenbach, Germany (R4, tab 1 at 111-2-3; tr. 1/102-03). ACT was the contractor's
interface with the government in Europe for the contract (tr. 1/110).

 10. The base year performance period was from 10 February 2003 through
9 February 2004. There was 1 option year. The contract also provided for up to 3 award
terms of 12 months each. (R4, tab 12 at 2-9)

 3
 11. The PWS Annex A in the contract as awarded (R4, tab 12 at 33) did not
contain the column of the Revised Annex A in Amendment 0001 that listed "Projected
Performance Start Date[s]" for the permanent registrars (supp. R4, tab 72 at 2-3).

 12. The contract requirement for the base year of the contract was for appellant to
provide 35 permanent registrars, an Indefinite Delivery/Indefinite Quantity (ID/IQ) figure
of TRs (see finding 15), 3 area managers initially for 7 months, and 1 project manager
(R4, tab 12 at 2-5). The contract's "Option Year l" and the 3 annual "Award Terms"
provided for 1 project manager and 35 permanent registrars (R4, tab 12 at 6-9).

 13. The PWS required registrars to review installation pass applications and
supporting documents, register pass applicants and Department of Defense ID Card
holders into the IACS database, and issue !ACS-generated installation passes in
accordance with specified Army regulations (R4, tab 12 at 22).

 14. Contract line item number (CLIN) 0003AA Registrars, specified a firm
fixed-price (FFP) of $4,080 per month for 12 months for each of35 permanent registrars,
or a total of 420 months. CLIN 0003AA provided for a total base year price of
$1,713,600.00. (R4, tab 12 at 3) CLIN 0003AB was identified as "ID/IQ Hourly
Overtime Rate, Registrars" at the unit price of $29.85, FFP. Overtime required
authorization by the government under PWS if 1.3.1. (R4, tab 12 at 4, 22)

 15. CLIN 0004AA, ID/IQ Temporary Registrars, established a firm fixed-price of
$3,440 per month for TRs for the base year. There was no total price for this CLIN.
CLIN 0004AA stated, "FFP .... Temporary Registrars must meet initial Phase 1 surge of
applicants and DOD ID Card holders during the conversion to the IACS.... Quantity:
Minimum 74, Maximum 150." (R4, tab 12 at 5) CLIN 0004AB was identified as "ID/IQ
Hourly Overtime Rate, Temporary Registrars" at the unit price of $27.95, FFP. Overtime
for TRs required authorization by the government under PWS if 1.3.1. (R4, tab 12 at 5,
22)

 16. The PWS required the project manager and the area managers to oversee the
registrars, ensure compliance with relevant regulations and with appellant's quality
control plan and ensure customer satisfaction. The project manager and area managers
were required to be "available either on-site or by telephone during working hours" and
to respond to customer telephone calls within one hour. (R4, tab 12 at 23)

 17. The area managers' services were specified by CLIN 0002 for the base year.
CLIN 0002 provided for 3 area managers for 7 months (21 total months) at $11,735.00
per month and a total price of $246,435.00. CLIN 0002 stated, "FFP." (R4, tab 12 at 2)
PWS if 1.4.1.1.4 assigned each of the 3 area managers to a specific ASG, stating: "Area
managers will be provided government furnished office space and equipment per section
2.0 of the PWS" (R4, tab 12 at 23).

 4
 18. Insofar as pertinent, FAR 52.212-4, CONTRACT TERMS AND CONDITIONS-
COMMERCIAL ITEMS (FEB 2002) provided the following contract provisions: if (c)
Changes, which provided that changes to the contract were to be made only by written
agreement of the parties; if (d), Disputes, which inter alia, incorporated by reference FAR
52.233-1, Disputes; if (i) Payment, which provided that payment was to "be made for
items accepted by the Government that have been delivered to the delivery destinations
set forth in this contract;" and if (s) Order of Precedence, which, as modified by the
"ADDENDUM TO FAR 52.212-4" (Addendum) provided that the PWS was to take
precedence over all other elements of the contract (R4, tab 12 at 11-17).

 19. The Addendum also contained an Ordering clause, if (t), subparagraph 7, which
stated in relevant part that "[a ]ny supplies and services to be furnished under IDIQ CL/Ns
of this contract shall be ordered by issuance of delivery orders or task orders by the
individuals or activities designated in the Schedule. Such orders may be issued during the
ordering periods identified/or each CLIN." (R4, tab 12 at 19) This clause was modified
in March 2003 by Modification No. (Mod. No.) POOOOl (see finding 30 below).

 20. The Addendum also contained an Indefinite Quantity clause, if (t),
subparagraph 9, which provided in relevant part:

 (a) This contract includes indefinite-quantity provisions for
 the supplies or services specified under the IDIQ CLIN
 specified in the Schedule, and effective for the period stated in
 the Schedule. The quantities ofsupplies and services
 specified in the Schedule are estimates only and are not
 purchased by this contract.
 (b) Delivery or performance shall be made only as
 authorized by orders issued in accordance with the Ordering
 clause. The Contractor shall furnish to the Government,
 when and if ordered, the supplies or services specified in the
 Schedule up to and including the quantity designated in the
 Schedule as the "maximum" The Government shall order at
 least the quantity ofsupplies or services designated in the
 Schedule as the "minimum. "

(R4, tab 12 at 19)

 21. PWS if 1.1.2 described that services were to be provided in two phases as
follows: "an initial, temporary surge to register USAREUR personnel already having
installation access ... [and] a sustained, long term processing of installation pass applicants.
See [PWS] Annex A for planned temporary and sustained minimum personnel
requirements." (R4, tab 12 at 22)

 5
 22. PWS it 1.3, Hours of Operation, provided:

 Normal operating hours for the Registrar positions are 9 hours
 per day (including lunch hour) Monday through Friday,
 excluding U.S. holidays, including German holidays. Based
 on planned or unforeseen operational requirements, the U.S.
 Government reserves the right to change the performance
 hours of Registrars and Managers, to meet permanent,
 immediate, and temporary changes in operational
 requirements. Each Registrar shall receive approximately
 four hours total of Government furnished initial training
 during these hours or during extended hours as agreed upon
 by the Contractor and Government.

(R4, tab 12 at 22)

Invoicing Under the Contract

 23. PWS it 8.0, Invoicing, required CI2to invoice the Army "monthly for services
performed the previous month. Present invoices to the COR [contracting officer's
representative] for verification in accordance with the requirements clause [FAR]
52.212-4 and Addendum" (R4, tab 12 at 31).

 24. PWS it 7 .1.2, Performance Requirements, authorized the fovernment to
withhold 3% of appellant's invoiced amounts for a month (which CI could regain in later
months) if appellant's performance fell below acceptable quality levels (AQLs) specified
in a Performance Requirements Summary Matrix (PRSM): "When performance is below
the stated AQL for a month, 3% of that billing period/month's invoice will be withheld
for administrative violations, and a prorated share for the quantifiable deficiencies
(absences, delays, fewer personnel report per shift, etc.) will be deducted' (R4, tab 12 at
30-31, Explanatory Note No. 2) (emphasis added).

 25. Appellant prepared its invoices in several steps. First, ACT would email a
draft invoice to the COR. The COR would confer with ACT and government personnel
at the ASGs to ensure that the hours shown in the invoices matched those on the
registrars' time sheets, and the hours worked by the project manager and area manager
for the month. (Tr. 1/49, 56) Next, ACT would email a spreadsheet to appellant's human
resources department in Atlanta listing the hours worked on the contract. After verifying
the accuracy of the spreadsheet with ACT, appellant's human resources department
would forward the spreadsheet to the accounts receivable department in Atlanta, which
would then create invoices for each CLIN and email the invoices to ACT to submit to the
Army. (Tr. 1/143-45, 151)

 6
 26. Upon receiving the monthly invoices from ACT, the COR again verified
appellant's invoiced hours with personnel at the ASGs and prepared Material Inspection
and Receiving Reports (DD Form 250s) (tr. 1/36-41). The DD Form 250s recorded the
quantities of services provided by cI2 in both man days and months (R4, tab 28 at 2, 4, 6,
8-12, 14-18).

 27. From the beginning of contract performance the Army made work sites
available to appellant's registrars and TRs in accordance with the staggered fielding of
the work sites during the ramp-up period (findings 4, 5). As far as the record shows,
appellant did not file any written objections with the CO to the staggered fielding of its
registrars during this period.

 28. With respect to those registrars assigned to specific work sites, there were
occasions when these registrars were unavailable or absent and worked fewer than the
required number of operating hours prescribed by the contract. When this occurred, CI2
invoiced the Army-at the Army's direction-for reduced amounts reflecting these
absences. (Tr. 1144-45) Thus, in June and July 2003, the Army and CI2 had discussions
by email and telephone about the preparation of appellant's monthly invoices (supp. R4,
tab 73 at 1-2, tab 75 at 8). In early July 2003, appellant's project manager emailed the
government a draft invoice for May 2003. Appellant initially calculated the monthly
invoice amounts for the project manager, area managers, and permanent registrars by
dividing by 12 the yearly price in the contract schedule for each CLIN; appellant did not
adjust for any absences. (Tr. 11146-47)

 29. In a conference call on 15 July 2003, the CO told CI 2 "so CI2 Atlanta would
understand[,] that the [government] never pays for services not utilized [and] that [only]
the unit price was firm and fixed," meaning that CI2 should invoice at the fixed monthly
rates only for the services it actually provided (supp. R4, tab 75 at 8; tr. 1145-50).
ci2 followed this government direction for the remainder of the contract (tr. 1146, 135),
that is, it invoiced for fractional months of registrar time, based on the hours the registrars
actually worked (tr. 1144-45). Appellant's claim would later seek the full monthly price
for these persons without regard to absences (see finding 47 below).

Contract Modifications

 30. Bilateral Mod. No. POOOOI 1 was signed by the CO on 21March2003,
effective retroactively to 10 February 2003 (R4, tab 13 at 1). Insofar as relevant,

1
 The record copy of Mod. Nos. POOOOl and P00002, infra, are not signed by appellant.
 Appellant does not dispute that these were bilateral contract modifications
 (app. reply br. at 30). We find that these contract modifications were signed by
 appellant.

 7
Mod. No. POOOOl: (1) added quantity to CLIN 0004AA of296 months for TRs for the
base year (74 TRs for four months each), increasing the total price of that CLIN "from
UNDEFINED to $1,018,240.00" (R4, tab 13 at 2); and (2) amended the Ordering clause
(R4, tab 12 at 19) to read: "Any supplies and services to be furnished under IDIQ CL!Ns
of this contract shall be ordered by issuance of modifications to the basic contract. Such
modifications may be issued during the ordering periods identified for each CLIN."
(R4, tab 13 at 3)

 31. Bilateral Mod. No. P00002 was signed by the CO on 12 September 2003,
effective retroactively to 9 September 2003 (R4, tab 14 at 1; tr. 3/26). Mod. No. P00002
did the following: (1) extended the performance period for three area managers under
CLIN 0002 by 3.68 months from 21.00 months to 24.68 months, from 9 September 2003
through 31 January 2004; (2) decreased the quantity of permanent registrars under CLIN
0003AA by 59.5 months from 420 months to 360.5 months; and (3) increased the
quantity ofTRs under CLIN 0004AA by 58 months, from 296 months to 354 months
(R4, tab 14 at 2).

 32. On or about 15 January 2004, the CO signed a MFRjustifying the exercise of
 the option year. The MFR included findings in accordance with FAR 17 .207 (c)(3) that
 the government's requirement still existed, funding was available, and appellant's
.option-year price was fair and reasonable. (Supp. R4, tab 76 at 4; tr. 3/35) With respect
 to the reasonableness of appellant's pricing, the Army considered the competition,
 including GSA schedule vendors (tr. 3/36).

 33. Under bilateral Mod. No. P00003 the government exercised the option year,
extending the performance period from 10 February 2004 to 9 February 2005 (R4, tab 15
at 1; supp. R4, tab 63). CLIN 1002 became effective for permanent registrars in the
option year. The modification also added CLINs 1003 (ID/IQ Hourly Overtime Rate,
Registrars), 1004 (ID/IQ, Temporary Registrars), and 1005 (Area Manager) to the
contract for the option year and substituted a revised PWS. (R4, tab 15 at 2, 3, 5-15) The
revisions to the PWS are immaterial to these appeals.

 34. Mod. No. P00003, CLIN 1004 provided for 216 months ofTRs at $3,509.00
per month, at a total price of $757,944.00. CLIN 1004 stated "FFP" and "SAME AS
CLIN 0004AA OF BASIC CONTRACT, AND AS PER REVISED PWS." Although the
acronym "ID/IQ" was included, there were no minimum and maximum quantities
identified. (R4, tab 15 at 3, 5)

Award Terms

 35. Attachment 2 to the contract set forth the "Award Term Plan" (ATP). The
introductory paragraph of the ATP stated:

 8
 This award term plan is the basis for the evaluation of the
 Contractor's performance and for presenting an assessment of
 that performance to the Award Term Determining Official
 (ATDO). This plan describes the specific criteria and
 procedures to be used to assess the Contractor's performance
 and to determine award terms earned. Actual award term
 determinations and the methodology for determining the
 award term are unilateral decisions made solely at the
 discretion of the Government.

(R4, tab 12 at 36) The ATP,~ 1.0, provided for up to three yearly award terms after the
option year (R4, tab 12 at 31, 36-37).

 36. The ATP provided for an Award Term Review Board (ATRB), consisting of
the CO, the COR, and a contract specialist to review the evaluation of CI2 's performance
and to prepare a report and recommendation to the ATDO as to whether CI2 had earned
an award term based upon its performance (R4, tab 12 at 36-38, ATP~~ 2.1 through
3.3.4). The government did not set up an ATRB in accordance with this contract
requirement.

 37. The ATP also stated:

 The A TDO approves the award term plan and any changes.
 The ATDO reviews the recommendation of the ATRB,
 considers all pertinent data, and determines if an award is
 earned. The ATDO cannot delegate the award Term
 decision, but can delegate other requirements in the Award
 Plan. The Chief of Division A, Wiesbaden Regional
 Contracting Center, is the ATDO. [Emphasis added]

(R4, tab 12 at 36, ~ 2.1) The ATDO did not make the award term decision in accordance
with this contract requirement.

 38. Under the ATP, CI2 could earn the first award term with "Satisfactory"
performance in the base year, defined as meeting at least four of the six AQLs in the
PRSM, including AQL 5. CI 2 could earn the second award term with "Very Good"
performance in the option year, defined as meeting at least five of the six AQLs in the
PRSM, including AQL 5. (R4, tab 12 at 37, ATP~~ 3.1 through 3.3) It is undisputed,
and we find that appellant's performance in the base and option years was sufficient to
earn the first award term and the second award term under the contract.

 39. ATP~ 5.1, Award Term Conditions, provided that "[n]o award term
extensions will be exercised unless ( 1) the Government has a continued need for the

 9
services under the contract, (2) funds are available, and (3) price reasonableness is
determined" (R4, tab 12 at 39). It is undisputed and we find that the government had a
continued need for registrar services and that funding was available for the first award
term. The parties dispute, however, whether the government assessed the reasonableness
of appellant's prices prior to deciding to deny any award terms.

 40. At the hearing, the CO testified that he performed market research of pricing
for purposes of the award term decision in or around October-November 2004 (tr. 3/45).
However, if 3.3.4 of the ATP plan provided that the ATDO was to inform the contractor
of the government's award term decision by 70 days after the end of the performance
period (R4, tab 12 at 38), which, for purposes of the first award decision, was April,
2004.

 41. The CO testified that he documented his market research on a notepad
(tr. 3/41). The notepad was not offered in evidence. According to the CO's testimony,
his market research identified nine potential vendors with applicable General Services
Administration (GSA) schedule contracts, and was used to derive a government cost
estimate for the forthcoming year in the amount of $2,513,295.00, which was
$345,633.00 lower than CI2's award term price (tr. 3/43-45). The CO testified that he
concluded that CI2's award-term price was unreasonably high and that the Army should
issue a solicitation for the contract requirements to GSA schedule holders through the
eBuy website (tr. 3/42-44). There is no documentary evidence in the record
memorializing the CO's findings and conclusions in this October 2004-November 2004
time period. The CO also stated he discussed his conclusion with the ATDO at that time
and that "she agreed" (tr. 3/41). There is no documentary evidence in the record
memorializing this discussion with the ATDO. The ATDO did not testify.

 42. The CO also testified that he orally advised appellant's project manager that
the government would not exercise any award terms because appellant's prices were
unreasonably high (tr. 3/52-53). There is no documentation of record substantiating this
conversation. Appellant's project manager did not testify.

 43. By letter to appellant dated 3 December 2004, the CO advised appellant as
follows:

 This letter is to inform you that the US Government will not
 exercise the award term under contract DAB NO l-03-C-0007.
 Subject contract therefore ends in its entirety on 09 February
 2005.

(Supp. R4, tab 50) Although at the trial the CO cited price unreasonableness as the basis
for denying the award term, the CO did not provide appellant with any explanation for
denying the award term in this letter.

 10
 44. The record contains an MFR dated 11January2005 signed by the CO.
According to the CO, a MFR was necessary to support a decision to use a non-DoD
contract vehicle (tr. 3/43). This document was dated more than one month after the CO
had issued the letter denying the award term to appellant. The MFR stated that "[t]he
requiring activity conducted a market research with vendors having GSA schedules that
meet their needs and is within their scope of work, quality and price." According to the
MFR, this market research of the requiring activity (not the CO) resulted in a
determination that the government could recognize significant cost savings if it used one
of the GSA schedule vendors, and therefore a non-DoD contract via the GSA schedule
was the best method for the purchase of the government's requirements. The MFR did
not mention any market research or price reasonableness determination by the CO in the
October-November 2004 time frame, as per the CO's testimony, nor did the MFR
conclude that appellant's award term prices were unreasonable. (Supp. R4, tab 51)

 45. Notably, the MFR provided justification for a one-year procurement only:

 Current services are required for a one year period to continue
 contract support for IACS. Services are not anticipated to be
 needed beyond this one year period.

(Supp. R4, tab 51)

 46. On 14 January 2005, the Army issued eBuy Request for Quotations
No. 64951, under GSA Schedule Contract No. GS-35F-5291H, for a project manager, an
area manager, and 35 registrars, from 10 February 2005 through 9 February 2006, with
optional temporary registrars and registrar overtime and no option years (supp. R4, tabs
53, 55). Four firms responded, including CI2 (supp. R4, tab 54). On 1 February 2005 the
Army awarded Order No. W912CM-05-F-0047 under Contract No. GS-35F-5291H to
ITT Federal Services International Corp. As awarded, the performance period was one
year, 10 February 2005 through 9 February 2006. (Supp. R4, tab 55 at 3 of 15)

Claims and Appeals

 47. On 8 February 2006, CI 2 submitted a certified claim for a total of
$865,478.61, requesting the "contract balance" for its employees under CLINs 0002,
0003AA, 0004AA, 0003AB, 0004AB, 1002, 1003 and 1004, that is, the full extended
monthly contract price, FFP, for each of these CLINs in the base year and option year,
including additional overtime (R4, tab 23). The bulk of this claim, $597,879.39, was for
TRs in the option year under CLIN 1004, Mod. No. P00003 (id., see Invoice# 241).
Appellant claimed that the government wrongfully failed to order the 216 monthly units

 11
set forth in CLIN 1004. 2 On 31August2007, the CO denied the certified claim (R4, tab
24). The Board docketed appellant's timely appeal as ASBCA No. 56257.

 48. On 20 December 2007, cf submitted a certified claim for $1, 772,622.53 for
the government's wrongful denial of two award terms (supp. R4, tab 58). On 24 January
2008, the CO denied the claim (supp. R4, tab 59). The Board docketed appellant's
timely appeal as ASBCA No. 56337.

 DECISION

ASBCA No. 56257

Base Year "Ramp-up Period" and Beyond

 It is undisputed that in the early months of the base year of the contract, the
government fielded registrars on a staggered basis based upon the need to set-up offices
and train personnel at each location. The details of this "ramp-up" period were provided
in Amendment 0001 to the solicitation, and included a comprehensive table of minimum
manning requirements and projected performance dates (findings 2-5). Based upon this
staggered fielding, the government did not order the full complement of 3 5 registrars
each month during the ramp-up period. Notwithstanding, appellant contends that it is
entitled to the full monthly contract price for the registrars throughout this period.

 We believe that appellant is not entitled to any recovery attributable to the specified
ramp-up period. Prior to award appellant understood Amendment 000 I to provide for a
ramp-up period, and factored the staggered ordering of registrars into its proposal (findings
6-7). Appellant thus relied upon this ramp-up process. Also, appellant did not
contemporaneously object to providing fewer registrars during the ramp-up period. This
reflected the parties' contemporaneous, mutual understanding of how the contract was to
work, to which we accord considerable weight. See Fincke v. United States, 675 F.2d 289,
295 (Ct. Cl. 1982); Fareast Service Co., ASBCA No. 50570 et al., 97-2 BCA ~ 29,279 at
145,682. Accordingly, we must deny appellant's claim for the full monthly contract price
for the registrars attributable to the ramp-up period.

 On the other hand after the ramp-up period, the parties modified the contract under
Mod. No. P00002, effective 9 September 2003, wherein the government decreased registrar
quantities, CLIN 0003AA, Permanent Registrars, from 420 months to 360.5 months and
increased CLIN 0004AA, Temporary Registrars, from 296 months to 354 months (finding

2
 It does not appear that the government disputes that it did not order 216 TR units
 during the option year, and we so find. Rather, the government contends that it
 was not contractually obligated to order 216 units because this quantity was an
 estimate only. See Decision, infra.

 12
 31 ). These mutually agreed upon quantity modifications were not estimates; they were
 binding contract obligations. To the extent the government failed to order these quantities
 during the base year of the contract the government breached the contract. See, e.g.,
 Donaldson Enterprises, Inc., ASBCA No. 57927, 13 BCA ii 35,368 at 173,559 (breach of
 commercial items contract). We remand to the parties to address the quantum issues.

 Absent Registrars in Base Year

- With respect to those registrars processing applications at the various work sites,
 the government would ascertain whether these registrars were present during normal
 business hours; if not, the government would require appellant to invoice a reduced
 amount to reflect any such absences (findings 28, 29). Appellant disputes these monthly
 adjustments, contending that the contract entitles appellant to the full monthly contract
 price stated in the contract schedule, regardless of absences during the month.

 We believe appellant's contract interpretation is unsupportable and unreasonable.
 The PWS provided for normal daily operating hours for registrar positions (finding 22),
 from which we conclude that the registrars had a duty to be present during these hours.
 Indeed, the PRSM provided for monthly deductions for quantifiable deficiencies such as
 "absences" (finding 24).

 In addition, during the QIA process incident to contract negotiation, the
 government made it clear that it expected registrar presence/coverage "ALL THE TIME."
 Appellant indicated that this was "doable." (Finding 8)

 Appellant cites fundamental federal procurement law that under a FFP contract the
 government must pay a contractor the firm-fixed contract price without regard to the
 costs incurred by the contractor. We have no argument with this basic principle, but
 question its applicability here. While it is correct that under a FFP contract the
 government is generally obligated to pay the full contract price for conforming product
 provided by a contractor, this is predicated on the contractor providing conforming
 product. Plainly, the government need not pay full contract price for less than
 conforming product.

 The latter was the case here. We believe the "product" purchased by the
 government under this contract, subject to the mutually recognized ramp-up period, was
 the performance of the registrars during the normal operating hours of the contract.
 Where registrars worked fewer than the normal operating hours, appellant did not provide
 full conforming product, and hence was not entitled to the full monthly contract price.

 Accordingly, we must deny appellant's claim.

 13
Absent Area Managers in Base Year

 Based upon contemporaneous input from the field, the government also
documented instances during which the contractually-prescribed area managers were
unavailable. Appellant does not dispute the unavailability of the area managers at these
times, but as above, it claims that it is entitled to the full, fixed monthly price in the
contract schedule for these area managers notwithstanding.

 We believe appellant's contract interpretation is unreasonable. The contract does
not support entitlement to the full, fixed monthly price in the contract schedule for area
managers when they were absent or unavailable. Appellant's claim is denied.

Registrar Overtime Base Year

 Appellant's claim includes a request for payment for additional overtime in the
base year for permanent registrars and TRs. In accordance with PWS if 1.3.1, overtime
had to be authorized by the government (findings 14, 15). Appellant has not shown that
the government authorized overtime hours beyond those authorized and paid for by the
government. Appellant's claim for overtime must be denied for lack of proof.

Temporary Registrars in Option Year

 The bulk of appellant's claim relates to the ordering ofTRs, Mod. No. P00003,
CLIN 1004 in the option year (finding 47). This CLIN provides for a specified quantity
of "216" TR units at a fixed monthly price for the option year. Appellant contends that
this obligated the government to order a minimum of 216 TR units in the option year,
which it failed to do; the government contends that it had no obligation to order this
quantity-this figure was an ID/IQ amount and was an estimate only. (Finding 34)

 A contract interpretation is favored that interprets the contract as a whole and
avoids conflicts and inconsistencies. Gardiner, Kamya & Associates, P. C. v. Jackson,
467 F.3d 1348, 1353 (Fed. Cir. 2006). The government's interpretation is unsupported
by the text of CLIN 1004, is inconsistent with the terms of the contract when viewed as a
whole and is inconsistent with the related regulations. CLIN 1004 does not state that the
specified 216 quantity was an "estimate" as the government claims. To the extent the
government contends that this quantity was an "indefinite" quantity, this interpretation is
inconsistent with the contract and the related regulations, which provide that indefinite
(ID/IQ) quantities are to be stated with minimum and maximum quantities (findings 15,
20). See FAR 16.504(a). CLIN 1004 does not contain such quantities. On the other
hand, appellant's interpretation is consistent with a reading of the contract as a whole,
insofar as it is consistent with the parties' agreement under Mod. No. POOOOl, wherein

 14
the parties agreed to order specific supplies and services under ID/IQ CLINs by future
contract modifications (finding 30). Mod. No. P00003 was such a contract modification.

 Based upon our reading of the contract as a whole and the parties' conduct
thereunder, we believe that appellant's interpretation is reasonable and the government's
interpretation is not. Assuming, arguendo, that CLIN 1004 is latently ambiguous,
appellant's interpretation would still prevail, based upon the doctrine of contra
proferentem, wherein we would resolve the ambiguity against the government as the
drafter of the contract modification. Gardiner, 467 F.3d at 1352.

 Accordingly, we believe that the government was obligated to order 216 TR units
in the option year under CLIN 1004, Mod. No. P00003. To the extent the government
failed to do so, it breached the contract. We remand to the parties to address quantum.

Absent Permanent Registrars and Registrar Overtime in the Option Year

 Appellant claims full compensation for registrar absences and additional overtime
for registrars in the option year similar to that claimed in the base year. For reasons
stated, supra, we deny these claims.

ASBCA No. 56337

Denial of Award Term

 As we held in our earlier decision, a government decision to deny an award term is
subject to review for abuse of discretion. Ci, Inc., ASBCA Nos. 56257, 56337, 11-2
BCA ~ 34,823 at 171,354, recon. denied, 11-2 BCA ~ 34,881. For reasons stated below,
we believe the government's denial of the award term on 3 December 2004 was an abuse
of discretion.

 Simply stated, the government owed appellant an award term decision in
accordance with the contract. The government did not fulfill this duty to appellant.
Indeed the government, for the most part, ignored the ATP provisions of the contract.
Under the ATP, the award decision was to be made by the ATDO, who was the only
person authorized to issue the decision on the award term; that authority expressly was
not delegable (finding 37). The ATDO did not issue the award term decision of
3 December 2004; hence, that decision was unauthorized by the express terms of the
contract.

 The contract also required that the award term decision was to be based upon the
recommendation of an A TRB. The government did not even set up an A TRB here.

 15
 The CO's unauthorized 3 December 2004 letter to appellant denying the award
term also gave appellant no reason for the government's decision. The CO's testimony
that he conducted market research, performed a price reasonableness review, concluded
that appellant's prices were unreasonable and that the ATDO agreed with him is
unsupported by any contemporaneous document of record and is unpersuasive.
(Finding 43)

 The government essentially acknowledges that appellant was entitled to the first
award term, except for its "determination" that appellant's prices were unreasonable. We
conclude that the government did not make such a determination prior to the issuance of
its 3 December 2004 letter in accordance with the ATP. On the other hand, the record
does contain the government's reviews of appellant's pricing of 24 January 2003 and of
15 January 2004, at which times the government twice conducted market research and
twice concluded that appellant's pricing was fair and reasonable (findings 9, 32), which
conclusions we adopt here.

 Accordingly, we conclude that the government's decision of 3 December 2004
denying an award term to appellant was a material breach of the contract and an abuse of
discretion. We remand to the parties to address quantum.

 We believe appellant's damages should be limited to those resulting from the
denial of the first award term only. Although there is evidence of record of appellant's
satisfactory performance in the option period to support the earning of a second award
term, the ATP makes clear that no award term may be granted unless there is a continued
need for the services, funding is available and appellant's prices are reasonable.
Assuming, arguendo, that appellant's prices remained reasonable, there is no evidence of
record showing the Army had a continued need for IACS services during the second
award term, from February 2006 through February 2007, or that funds were available if
there was such a need. To the contrary, the record shows the GSA schedule procurement
was for a one-year period, and the government did not anticipate the need for IACS
services beyond that period (finding 45).

 16
 CONCLUSION

 For reasons stated, ASBCA No. 56257 is granted, in part, consistent with this
opinion. ASBCA No. 56337 is granted, in part, consistent with this opinion. The parties
are directed to negotiate quantum.

 Dated: 5 March 2014

 Administrative Judge
 Armed Services Board
 of Contract Appeals

I concur

~Ri#4
Administrative Judge Administrative
Acting Chairman Acting Vice Ch
Armed Services Board Armed Services oard
of Contract Appeals of Contract Appeals

 I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 56257, 56337, Appeals of
CI 2, Inc. rendered in conformance with the Board's Charter.

 Dated:

 JEFFREY D. GARDIN
 Recorder, Armed Services
 Board of Contract Appeals

 17